### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. CR-24-13-SLP |
| v. ) | |
| ) | |
| JOSE ANTONIO DUQUE-RAMIREZ, ) | |
| ) | |
| Defendant. ) | |

### O R D E R

Before the Court are Defendant's Motion to Withdraw Guilty Plea [Doc. No. 57] and his Motion to Dismiss the Indictment Based on the Unconstitutionality of 18 U.S.C. § 922(g)(5)(A) [Doc. No. 56]. The Government has responded to both Motions, [Doc. Nos. 59, 66], and Defendant filed a Reply in support of the Motion to Withdraw [Doc. No. 65]. The parties also submitted a Joint Statement of Undisputed Facts [Doc. No. 69] relevant to the Motion to Dismiss. Accordingly, the matter is fully briefed and ripe for determination. For the reasons that follow, Defendant's Motion to Dismiss the Indictment is DENIED, and his Motion to Withdraw Guilty Plea is DENIED as MOOT.[1]

---

[1] In his Reply, and at the hearing on his Motion to Withdraw Guilty Plea, Defendant stated he does not seek to withdraw his guilty plea if the Court will rule on his Motion to Dismiss. *See* [Doc. No. 65] at 1. All the arguments in his Motion to Withdraw Guilty Plea are dependent upon the success of his Motion to Dismiss—he does not contend he is factually innocent of the crime charged, but that § 922(g)(5)(A) is unconstitutional as applied to him. *See* Mot. [Doc. No. 57] at 1-11. At the hearing, the parties agreed the Court's decision on the Motion to Dismiss is dispositive of the Motion to Withdraw. Accordingly, due to the unique circumstances of this case, the Court addresses the Motion to Dismiss as dispositive of both motions.

I.  **Background**

The procedural history of this case is set forth in the Court's Order entered on August 26, 2024 [Doc. No. 63], and the parties submitted a Joint Statement of Undisputed Facts [Doc. No. 69]. The Court refers to those filings for comprehensive summaries of the facts and procedural history.

As relevant here, Defendant previously moved to dismiss the Indictment, asserting § 922(g)(5)(A) is unconstitutional under the Supreme Court's decision in *N.Y. State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022). [Doc. No. 25]. Defendant asserted a facial challenge but attempted to insert an as-applied challenge at the end of his Reply. *See* Reply [Doc. No. 34] at 6-7; *see also* Order [Doc. No. 35] at 2 n. 2. The Court declined to consider the as-applied challenge made for the first time in Defendant's Reply, and further explained any such challenge was premature prior to trial because the factual record had not been sufficiently developed. *See* Order [Doc. No. 35] at 2 n. 2. The Court did so "without prejudice to [Defendant's] right to later assert an as applied challenge." *Id.*

The Court denied Defendant's first Motion. *Id.* at 3-15. As fully set forth in its Order, the Court assumed, without definitively concluding, the Second Amendment's plain text covers noncitizens unlawfully present in the United States.[2] The Court went on to find the Government met its burden to show § 922(g)(5)(A) is consistent with this nation's historical tradition of firearm regulation, therefore the statute is not facially

---

[2] Where possible, the Court used the term "noncitizen" in lieu of the statutory term "alien" in its Order because the former is common nomenclature in recent decisions by the Supreme Court. *Id.* at 3 n. 3. It does so here as well.

unconstitutional. *Id.* at 9-15.

On April 3, 2024, Defendant entered a plea of guilty to the lone count of the Indictment. *See* [Doc. Nos. 40-42]. Then on August 12, 2024, prior to sentencing, Defendant filed his second Motion to Dismiss the Indictment [Doc. No. 56], this time asserting an as-applied challenge to § 922(g)(5)(A). As noted, Defendant and the Government have submitted a Joint Statement of Undisputed Facts [Doc. No. 69] relevant to the Motion to Dismiss, which the Court incorporates here. Accordingly, there is a sufficient factual record for consideration of an as-applied challenge, and the matter is ripe for decision.

## II.    Governing Standard

Unlike a facial challenge, which requires the moving party to "establish that no set of circumstances exists under which the [statute] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), "'an as-applied challenge tests the application of that restriction to the facts of [the defendant's] concrete case.'" *Harmon v. City of Norman*, 61 F.4th 779, 789 (10th Cir. 2023) (quoting *iMatter Utah v. Njord*, 774 F.3d 1258, 1264 (10th Cir. 2014)). Importantly for purposes of this case, however, "the same substantive standard applies to both facial and as-applied challenges." *Id.*; *see also Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) ("[C]lassifying a lawsuit as facial or as-applied . . . does not speak at all to the substantive rule of law necessary to establish a constitutional violation.").

In *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court held the Second Amendment protects an individual's right to keep and bear arms for self-defense. After those decisions, Courts of

Appeals analyzing Second Amendment challenges utilized a two-step framework that combined history with means-end scrutiny to determine the constitutionality of restrictions on Second Amendment rights. *Bruen*, 597 U.S. at 17. In *Bruen*, the Court "reiterated" that "*Heller* relied on text and history" and "did not invoke any means-end test such as strict or intermediate scrutiny." *Id*. at 22-24. The Court therefore rejected means-end scrutiny and explained the appropriate test is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 19-24.

During the time period between the filing of Defendant's motions, the Supreme Court decided *United States v. Rahimi*, 602 U.S. ----, 144 S. Ct. 1889 (2024). Applying *Bruen*'s historical analysis, the Court upheld the constitutionality of 18 U.S.C. § 922(g)(8)(C)(i), which disarms persons against whom a court has issued a restraining order and has found that the person poses "a credible threat to the physical safety" of a protected person. *Id.* at 1898-99. While it offered some clarification on the Government's burden under *Bruen*, *see* Section III(B), infra, *Rahimi* did not change the overall framework for a Second Amendment challenge. *See id.*

Accordingly, the Court must decide: (1) whether the plain text of the Second Amendment covers the conduct at issue; and, if so (2) whether the Government can establish that the challenged regulation is consistent with the historical tradition of firearms

4

regulation in the United States. *See Bruen*, 597 U.S. at 24; *see also Rahimi*, 144 S. Ct. at 1898.

### III. Discussion

#### A. The Court assumes, without deciding, Defendant is covered by the plain text of the Second Amendment.

As in its Response to Defendant's prior motion, the Government asserts noncitizens unlawfully present in the United States are not among "the people" covered by the plain text of the Second Amendment. Resp. [Doc. No. 66] at 12-23. Defendant, on the other hand, maintains he is a member of "the people" because the term is broader than the term "citizen" and he has substantial connections to the United States. Mot. [Doc. No. 56] at 6-9. To that end, Defendant refers to the undisputed facts that he has lived in the United States more than twenty-five years, during which time he attended public school, filed tax returns, married a United States citizen, and had multiple children born here. *Id.* at 8-9.

In its prior Order, the Court determined the appropriate course of action was to assume, without deciding, noncitizens unlawfully present in the United States are covered by the Second Amendment's plain text. [Doc. No. 35] at 4-9. The Court did so based on the Tenth Circuit's decision in *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012), where the Circuit assumed that "the people" covered by the Second Amendment could include "at least some aliens unlawfully here." *Id.* at 1169. The Circuit refrained from deciding the issue because, among other reasons, it could "still easily find § 922(g)(5) constitutional" applying means-end scrutiny. *Id.* at 1169.

The Tenth Circuit described this issue as "vexing" due to its "large and complicated"

nature, and particularly because of the tension between dicta in *Heller* and the Supreme Court's prior decision in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). *See Huitron-Guizar*, 678 F.3d at 1168-69. The Circuit explained: "*Verdugo-Urquidez* teaches that 'People' is a word of broader content than 'citizens,' and of narrower content than 'persons'"—while *Heller* "frequently . . . connected arms-bearing and citizenship" throughout the opinion, despite the fact that it relied on *Verdugo-Urquidez*. *Id*. at 1167-68 (citations omitted).

As this Court previously explained, the tension discussed in *Huitron-Guizar* is amplified by the fact that *McDonald* and *Bruen* likewise used the term "citizens" in multiple instances with reference to the Second Amendment right, though neither case decided this issue. Order [Doc. No. 35] at 5-7 (citing *McDonald*, 561 U.S. at 767-76 and *Bruen*, 597 U.S. at 9, 15, 26, 29, 31, 38, 60, 70). More recently, the *Rahimi* Court used the term "citizens" but did not clarify whether the right is only held by such individuals. 144. S. Ct. at 1902-03; *see also United States v. Medina-Cantu*, 113 F.4th 537, 541-42 (5th Cir. 2024) ("*Rahimi*, like *Bruen*, provides little clarification as to *who* is protected by the Second Amendment.").

Accordingly, the question of whether noncitizens unlawfully present are covered by the plain text of the Second Amendment has not been answered since the Court's decision on Defendant's first motion, and restraint is equally appropriate here. As before, the Court can answer the constitutional question under the second part of the *Bruen* analysis without

6

needing to definitively rule on the first question.³  For these reasons, the Court assumes, without deciding, Defendant is included within the Second Amendment's reference to the right of "the people" to bear arms.  *See Huitron-Guizar*, 678 F.3d at 1169.  The Court therefore moves to the second step of the *Bruen* inquiry.

**B. Section 922(g)(5)(A) is consistent with the Second Amendment's historical understanding.**

Focusing on the historical inquiry, the *Rahimi* Court began its analysis by noting "some courts have misunderstood the methodology of" *Heller* and *Bruen*, which "were not meant to suggest a law trapped in amber."  144 S. Ct. at 1897.  The Court reiterated: "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791."  *Id.* at 1897-98.  The Court then summarized the *Bruen* historical analysis as follows:

> A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit," apply[ing] faithfully the balance struck by the founding generation to modern circumstances." . . .
>
> Why and how the regulation burdens the right are central to this inquiry.  For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin."

---

³ As in *Huitron-Guizar*, "if the right didn't apply at all, the case would be at an end." 678 F.3d at 1169.  But if the right does apply, the question is whether § 922(g)(5) aligns with this nation's historical tradition of firearm regulation.  Because the Court finds that it does, it need not decide the first question.

7

*Id.* at 1898 (citations omitted).

In this case, the Court previously found the Government met its burden to show § 922(g)(5)(A) is consistent with the Nation's historical tradition of firearm regulation. Order [Doc. No. 35] at 9-15. Joining the weight of authority on this issue, the Court found § 922(g)(5)(A) is relevantly similar to historical firearm bans, primarily colonial laws disarming individuals who refused to swear an oath of allegiance to the new states. *Id.* at 12-15. Consistent with *Bruen*'s historical test, the Court found a comparable burden on the right—i.e., a total prohibition on firearm access. *Id.* at 12-13 (citing *United States v. Leveille*, 659 F. Supp. 3d 1279, 1285 (D.N.M. 2023)). Moreover, the "why" behind the bans is sufficiently comparable because both Congress and historical legislatures believed "prohibiting firearms to those who have not demonstrated allegiance to this nation might put weapons in the hands of those who would do the nation harm." *Id.* at 13 (citing *Leveille*, 659 F. Supp. 3d at 1285 and *Huitron-Guizar*, 678 F.3d at 1170); *see also Rahimi*, 144 S. Ct. at 1898 ("if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations.").

To the extent the parties reassert their arguments from the facial challenge, *see* Mot. [Doc. No. 56] at 10, the Court incorporates the full analysis in its prior Order and does not repeat it here. The Court emphasizes, however, that nothing in *Rahimi* alters the Court's analysis or conclusion. Indeed, *Rahimi* supports the conclusion that comparison of the underlying danger justifications behind § 922(g)(5)(A) and historical bans is not overly

broad, as Defendant contended.  *See* Order [Doc. No. 35] at 14-15; *see also Rahimi*, 144 S. Ct. at 1901 ("we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse" (citing *Heller*, 554 U.S. at 626)).

For his as-applied challenge, Defendant asserts: (1) history warrants an individualized assessment of him because founding-era laws disarming loyalists only did so after an individualized assessment as to whether the individual was untrustworthy or dangerous; and (2) the undisputed facts demonstrate he is not dangerous or untrustworthy. Mot. [Doc. No. 56] at 10-13.  For its part, the Government primarily asserts an individualized assessment of Defendant's dangerousness is not warranted because: (1) the historical bans applicable to loyalists did not involve any individualized determination and solely turned on whether a person had sworn an oath of allegiance; and (2) *Bruen* does not require individualized determinations.  *See* Resp. [Doc. No. 66] at 25-28.

The Court agrees with the Government that, for purposes of a categorical ban such as § 922(g)(5), individualized analysis imposes a burden more demanding than *Bruen* provides.  The second step of *Bruen*'s test requires the Government to "demonstrate that the regulation [at issue] is consistent with this Nation's historical tradition of firearm regulation"—which involves a regulation-to-regulation comparison rather than consideration of individualized circumstances.  *See* 597 U.S. at 17; *see also United States v. Wagoner*, No. 4:20-CR-00018, 2022 WL 17418000, at *4 (W.D. Va. Dec. 5, 2022) (after *Bruen*, "it appears that the constitutionality of a firearm regulation should rise and fall only on whether the challenged law is facially consistent with the Nation's historical tradition

9

of firearm regulation—without regard to the circumstances of . . . any particular defendant.").[4]

Section 922(g)(5)(A) is a categorical, status-based ban that applies to any noncitizen "illegally or unlawfully in the United States" without individualized consideration of their dangerousness. That is a significant difference between § 922(g)(5)(A) and other laws like the subsection at issue in *Rahimi*, which applies to individuals against whom a court has issued a restraining order and has found that the person poses "a credible threat to the physical safety" of a protected person. 144 S. Ct. at 1897-99 (citing 18 U.S.C. § 922(g)(8)(C)(i)). *Rahimi* suggests that distinction is important:

> The burden Section 922(g)(8) imposes on the right to bear arms also fits within our regulatory tradition. While we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse, *see Heller*, 554 U.S., at 626 . . . we note that Section 922(g)(8) applies only once a court has found that the defendant "represents a credible threat to the physical safety" of another. § 922(g)(8)(C)(i). That matches the [historical] surety and going armed laws, which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon.

*Id.* at 1901-02; *see also United States v. DeBorba*, 713 F. Supp. 3d 1042, 1057 (W.D. Wash. 2024) ("'Unlike the "dangerousness" laws, § 922(g)(8) requires an individualized determination of dangerousness during an adversarial civil hearing.' . . . Surety laws did

---

[4] More broadly, *Bruen* made clear it does not require a historical "dead ringer" or "twin," 597 U.S. at 30, and *Rahimi* attempted to resolve any misunderstanding about *Bruen*'s historical test by stating it was not meant to "suggest a law trapped in amber." 144 S. Ct. at 1897. *Rahimi* also restated "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98. Given that recent guidance, requiring the Government to show Defendant would have been disarmed in colonial America under identical circumstances imposes a burden greater than *Bruen* established.

10

the same thing."). While consideration of dangerousness may be appropriate for a firearm ban that depends on such a finding, it is not necessary where the law at issue is a categorical ban like § 922(g)(5)(A).[5]

The Court disagrees with Defendant that the historical record shows individualized determinations are warranted. *See* Mot. [Doc. No. 56] at 10-13. Both parties cite to a historical article discussed in numerous post-*Bruen* decisions: Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 L. & HIST. REV. 139 (2007). In that article, Professor Churchill describes an early American tradition of bans that turned solely on oaths of allegiance: "when provincial and early state governments disarmed non-associators during the American Revolution, they generally followed the colonial precedent that free white men might be disarmed only if they refused a test of allegiance that defined membership in the body politic." *Id.* at 158. After the Declaration of Independence, "new state governments returned to colonial precedent and framed their police power to disarm around a test of allegiance", with "voluntary allegiance as the standard of membership in the body politic" and therefore the right to bear arms. *Id.* at 159. He concludes the relevant discussion by stating: "the right to keep arms was the 'birthright' of any American who voluntarily professed his allegiance to the new American states." *Id.* at 161.

---

[5] Although not identical, § 922(g)(5)(A) is similar to § 922(g)(1) with respect to the categorical, status-based nature of the law, and the Supreme Court has repeatedly suggested § 922(g)(1) is constitutional. *See Heller*, 554 U.S. at 626–27, n. 26 (describing the felon-in-possession ban as "presumptively lawful."); *see also Bruen*, 597 U.S. at 80 (Kavanaugh, J. concurring); *Rahimi*, 144 S. Ct. at 1901.

Accordingly, the Government has shown the determinative factor for dispossession of a firearm across these colonial laws was a refusal to swear an oath of allegiance—without specific inquiry regarding individual dangerousness or risk of violence. *See id.* Moreover, nothing in the historical record before this Court indicates there was a tradition that a loyalist could still be permitted to carry a firearm despite not having sworn an oath. *See id.* at 155-161; *see also* Resp. [Doc. No. 66] at 25-26; Mot. [Doc. No. 56] at 10-13.[6]

Based on the historical record before the Court, it is clear an individual would have been disarmed for having not sworn an oath of allegiance even if they were not particularly dangerous or untrustworthy. *Cf. Atkinson v. Garland*, 70 F.4th 1018, 1023 (7th Cir. 2023) ("[A]lthough [the defendant] has shown some support for the idea that a group's "dangerousness" is what mattered to the Founders, he does not provide much historical basis for individualized assessments. . ."); *United States v. Young,* No. 2:22-CR-20 JD, 2023 WL 8697936, at *3 (N.D. Ind. Dec. 15, 2023) ("the historical record shows strong support for the ability to categorically prohibit a defined group from possessing arms based on the legislature's assessment the group was dangerous or untrustworthy, without

---

[6] Professor Churchill describes two sets of laws which could potentially be considered narrow exceptions to the otherwise categorical, oath-based bans of the time—neither of which persuade the Court that history dictates individualized determinations of dangerousness. First, during the seven-month period between December 1775 and July 1776, Pennsylvania disarmed "disaffected" non-associators, but not "well-affected" non-associators. *Id.* at 158-59. This seven-month law hardly demonstrates a historical tradition due to its temporary nature, and it is unclear exactly how that distinction was put into effect. Second, New Jersey permitted a "Council of Safety" to tender an oath of allegiance to persons suspected of being "dangerous or disaffected" and to try, imprison, or exile those who refused the oath. *Id.* at 160 n. 52. A related New Jersey provision authorized the Council to disarm those "they shall judge disaffected." *Id.* But the nuance of this New Jersey law is clearly an outlier among states disarming loyalists, and Professor Churchill states it is unclear whether the disarmament "provision referred only to those who had refused the oath and on whom the Council had passed judgment, or to all persons coming under suspicion." *See id.*

12

individual dangerousness assessments of group members.").

As this Court and others have acknowledged, historical allegiance laws are not perfectly analogous to § 922(g)(5)(A) "because many undocumented immigrants do not so much *refuse* as lack any legitimate opportunity to swear such an oath"—but they are "relevantly similar" nonetheless. *See* Order [Doc. No. 35] at 14; *Leveille*, 659 F. Supp. 3d at 1284-85; *United States v. Gil-Solano*, 699 F. Supp. 3d 1063, 1072 (D. Nev. 2023), (acknowledging the two are not "a perfect match" but are "relevantly similar"). The colonial bans for refusal to swear an oath of allegiance were categorical bans that did not distinguish between individualized circumstances any more than does § 922(g)(5)(A)'s requirement that the individual be "illegally or unlawfully present." As such, § 922(g)(5)(A) is "relevantly similar" with respect to the burden on Defendant and a loyalist in colonial America—both were subject to disarmament without any particularized finding regarding dangerousness.[7]

As before, the Court is also persuaded by the weight of authority finding § 922(g)(5)(A) constitutional in the context of both facial and as-applied challenges. That

---

[7] Defendant relies on cases from other jurisdictions which have found individualized analyses are necessary: *United States v. Carbajal-Flores*, No. 20-CR-00613, 2024 WL 1013975, at *4 (N.D. Ill. Mar. 8, 2024) (finding § 922(g)(5) unconstitutional as applied); and *United States of America v. Griffin*, No. 21-CR-00693, 2023 WL 8281564 (N.D. Ill. Nov. 30, 2023) (finding § 922(g)(1) unconstitutional as applied); *United States v. Williams*, 113 F.4th 637, 662 (6th Cir. 2024) (upholding the constitutionality of § 922(g)(5) as-applied); *United States v. Duarte*, 101 F.4th 657 (9th Cir.), *reh'g en banc granted, opinion vacated*, 108 F.4th 786 (9th Cir. 2024). Those cases are not binding on this Court, and the historical record discussed by the Government in this case shows a sufficient tradition of disarming loyalists who refused an oath of allegiance without individualized assessment. In any event, for the reasons set forth above, the Court is not convinced that individualized assessment is warranted under *Heller*, *Bruen*, and *Rahimi*, at least for a categorical ban like § 922(g)(5)(A).

trend has continued since this Court decided Defendant's facial challenge.[8]  For all these reasons, the Court finds Defendant's as-applied challenge is without merit, and § 922(g)(5)(A) is consistent with this Nation's historical tradition of firearm regulation.

## IV.    Conclusion

For the reasons set forth, Defendant's Motion to Dismiss the Indictment Based on the Unconstitutionality of 18 U.S.C. § 922(g)(5)(A) [Doc. No. 56] is DENIED, and his Motion to Withdraw Guilty Plea [Doc. No. 57]  is DENIED as MOOT.

IT IS SO ORDERED this 16th day of October, 2024.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE

---

[8] *See, e.g., United States v. Chavira-Ornelas*, No. 1:23-CR-01711-KWR-1, 2024 WL 3875796, at *1-7 (D.N.M. Aug. 20, 2024) (finding § 922(g)(5) constitutional as applied because "loyalty-based oaths are an appropriate historical analogue that demonstrates that § 922(g)(5) is consistent with this Nation's historical tradition of firearm regulation."); *United States v. Pierret-Mercedes*, No. CR 22-430, 2024 WL 1672034, at *14-22 (D.P.R. Apr. 18, 2024) (rejecting both facial and as-applied challenges based on a thorough discussion of historical analogues); *United States v. Astacio-Mieses*, 2024 WL 4304630, at *8 (D.P.R. Sept. 26, 2024) ("Defendant's constitutional challenge to [§ 922(g)(5)(A)] fails, whether considered a facial or an as-applied challenge."); *United States v. Astacio-Mieses*, CR 23-028, 2024 WL 4304630, at *1-8 (D.P.R. Sept. 26, 2024) (rejecting facial and as-applied challenges to § 922(g)(5)(A)); *United States v. Figueroa-Camarillo*, No. 1:23-CR-00946-WJ, 2024 WL 1596882, at *1-5 (D.N.M. Apr. 12, 2024) (rejecting an as-applied challenge to § 922(g)(5)(A) under *Bruen*); *United States v. Pena-Moreno*, No. 23-20202, 2024 WL 1395139, at *1-3 (E.D. Mich. Mar. 31, 2024) (rejecting facial and as-applied challenges to § 922(g)(5) under *Bruen*'s first step); *United States v. Gonzalez-Peralta*, No. 24-CR-10020-01-EFM, 2024 WL 3677485, at *2-5 (D. Kan. Aug. 5, 2024) (finding § 922(g)(5) constitutional as-applied under *Bruen*'s first step); *United States v. Salazar*, No. 24-CR-125-JFH, 2024 WL 2946569, at *1-2 (N.D. Okla. June 11, 2024) (rejecting a facial challenge to § 922(g)(5)); *United States v. Medina-Cantu*, 113 F.4th 537, 538-42 (5th Cir. 2024) (holding noncitizens unlawfully present are not covered by the plain text of the Second Amendment); *United States v. Alvarez*, No. CR H-20-297, 2024 WL 3166935, at *3 (S.D. Tex. June 25, 2024) ("Defendant's facial challenge to [§ 922(g)(5)(A)] fails because at least some illegal aliens are not protected by the Second Amendment."); *United States v. Jeffers*, No. 3:23-CR-0010, 2024 WL 1603501, at *1-5 (D.V.I. Apr. 12, 2024) (rejecting a facial challenge to § 922(g)(5)(A)).